**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| SHYRIAA HENDERSON, on behalf of herself, and all others similarly situated, | No. 17-55373 |
| *Plaintiff-Appellant*, | D.C. No. 3:13-cv-01845-JLS-BLM |
| v. | |
| UNITED STUDENT AID FUNDS, INC., DBA USA Funds, | OPINION |
| *Defendant-Appellee.* | |

Appeal from the United States District Court
for the Southern District of California
Janis L. Sammartino, District Judge, Presiding

Argued and Submitted October 10, 2018
San Francisco, California

Filed March 22, 2019

Before: Dorothy W. Nelson, William A. Fletcher,
and Jay S. Bybee, Circuit Judges.

Opinion by Judge D.W. Nelson;
Dissent by Judge Bybee

## SUMMARY[*]

**Telephone Consumer Protection Act**

The panel reversed the district court's grant of summary judgment in favor of the defendant, the owner of the plaintiff's student loans, and remanded for further proceedings in an action under the Telephone Consumer Protection Act.

The panel held that a reasonable jury could hold the defendant vicariously liable for alleged TCPA violations by debt collectors. The defendant hired a student loan servicer, which hired the debt collectors. The panel held that the defendant was not per se vicariously liable under FCC orders. Under federal common law, however, there were genuine issues of material fact as to whether the defendant ratified the debt collectors' calling practices and had a principal-agent relationship with the debt collectors.

Dissenting, Judge Bybee agreed that the FCC orders did not create per se liability. He wrote that, assuming ratification may create an agency relationship, he disagreed with the majority that there was a material issue of fact as to whether the defendant ratified the debt collectors' conduct or granted the debt collectors implied actual authority to violate the TCPA.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Alexander Glenn Tievsky (argued), Roger Perlstadt, and Ryan D. Andrews, Edelson PC, Chicago, Illinois; Kas Gallucci, Alexis Wood, and Ronald A. Marron, Law Offices of Ronald A. Marron, San Diego, California; for Plaintiff-Appellant.

Lisa Marie Simonetti (argued), Vedder Price (CA) LLP, Los Angeles, California; Bryan K. Clark, Vedder Price P.C., Chicago, Illinois; for Defendant-Appellee.

**OPINION**

D.W. NELSON, Circuit Judge:

*OVERVIEW*

Shyriaa Henderson appeals the district's order granting summary judgment in favor of Defendant-Appellee United Student Aids Funds, Inc. (USA Funds). The district court incorrectly held that a reasonable jury could not hold USA Funds vicariously liable for the debt collectors' alleged Telephone Consumer Protection Act (TCPA) violations. Accordingly, we **REVERSE** and **REMAND**.

*BACKGROUND*

Henderson applied for and received a loan to attend university through the Federal Family Education Loan Program (FFELP). After experiencing some financial difficulty, she stopped paying back her loans. Then, five different debt collection companies started calling her about the money she had not paid back. Henderson received pre-recorded messages many times in short intervals on a phone

number she neither provided in connection with her student loans nor consented to be called on. Henderson contends this pattern shows that the companies were combining the use of skip tracers and auto dialers.

Navient Solutions, Inc., a servicer of student loans, hired these debt collectors to collect on unpaid loans on behalf of USA Funds, which owned Henderson's loans. USA Funds operates under a government program by which it guarantees student loans made by private lenders and then takes ownership of those loans if a student-borrower defaults.

Although USA Funds owns billions of dollars in student loan debt, it does not interact with the borrowers directly once they stop paying back their loans. Instead, it hires companies, like Navient, to service its loans, including debt collection. In turn, Navient hires debt collectors to collect on defaulted loans. The debt collectors handle many aspects of collecting and repayment, including making calls to borrowers, setting up payment plans, granting temporary delays, and accepting loan payments.

While USA Funds did not have a contractual relationship with the debt collectors or any day-to-day dealings with them, USA Funds had access to Navient's daily, weekly, and monthly reports tracking the debt collectors' performance. Similarly, USA Funds could, and did, review debt collectors' calling notes when it had "an issue" with a debt collector's calling practices. USA Funds also regularly reviewed Navient's operations and performance, including its regulatory compliance, or lack thereof. Though USA Funds' service agreement with Navient did not give USA Funds the ability to fire debt collectors, USA Funds could ask Navient to replace underperforming collectors and could have fired Navient if it did not comply.

USA Funds also conducted an annual audit of the debt collectors. The audit focused on the various repayment programs that borrowers had a right to use in the FFELP. TCPA compliance was not one of the FFELP audit parameters. However, during each of USA Funds' audits from 2000, 2009, and 2010, debt collectors called borrowers on phone numbers that they did not consent to be called on, prompting USA Funds to note "improper collection practices" and to recommend "corrective action." Navient, however, continued to use these debt collectors, and USA Funds did not object when the same debt collectors were used in the following years. Moreover, USA Funds was aware that debt collectors handling USA Funds' loans had been sued regarding their calling practices but USA Funds did nothing to ensure TCPA compliance.

Henderson sued USA Funds for alleged TCPA violations related to the collection of her student loan debt. Though Henderson also sued Navient and several debt collectors, those defendants were dismissed for lack of personal jurisdiction.

## *STANDARD OF REVIEW*

We "review a district court's grant of summary judgment de novo" to determine "whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Oklevueha Native Am. Church Of Haw., Inc. v. Lynch*, 828 F.3d 1012, 1015 (9th Cir. 2016). We view the facts "as a whole and in the light most favorable to the party opposing the motion." *Pavoni v. Chrysler Grp., LLC*, 789 F.3d 1095, 1098 (9th Cir. 2015). "An issue of material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## *DISCUSSION*

Henderson challenges the district court order granting USA Funds' summary judgment motion on two grounds. First, Henderson argues that under an FCC order, USA Funds is per se vicariously liable for the debt collectors' TCPA violations. Second, she argues that USA Funds is similarly liable under the federal common law agency principles of ratification and implied actual authority. Henderson's theory of liability is that USA Funds has a principal-agent relationship with the debt collectors and that a court may hold it liable for their TCPA violations. We agree. We, therefore, reverse the district court's summary judgment order because there are "genuine issues of material fact" as to whether USA Funds ratified the debt collectors calling practices. We remand for further proceedings.

## I.  TCPA Liability

Under the TCPA, it is unlawful to "to make any call (other than . . . with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service."  47 U.S.C. § 227(b)(1)(A)(iii). Telemarketers, debt collectors, and others obtain phone numbers consumers did not consent to be called on through skip tracing.[1] Because consumers did not provide these callers with their phone numbers, the consumers have not given "prior express consent" to be

---

[1] Skip tracing is the process of obtaining previously-unknown phone numbers associated with the name on an account, such as by contracting with "third-party database services" or by "calling an individual's relatives [and] known acquaintances." (Deposition of Mark A. Verbrugge, senior director of operations within portfolio management at Navient).

called on those numbers. Therefore, if the numbers were also auto dialed, the calls violated the TCPA. 47 U.S.C. § 227(b)(1)(A)(iii).

Debt collectors that auto dialed Henderson on a phone number she did not provide in connection with her student loan would be liable under this section. For USA Funds to be liable under this section, Henderson must show that there is an agency relationship between USA Funds and these liable debt collectors.

## II. FCC Orders Do Not Create Per Se TCPA Liability

Henderson argues that USA Funds is per se vicariously liable for the debt collectors' alleged TCPA violations. She bases this conclusion on her analysis of *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C. Rcd. 559, 565 (2008) ("2008 FCC Order"), which states, "[c]alls placed by a third party collector on behalf of that creditor are treated as if the creditor itself placed the call." Because Congress has not acted directly on this issue and because the 2008 FCC Order is a fully adjudicated declaratory ruling, the panel must afford it *Chevron* deference. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 843 (1984). Though the 2008 FCC Order implies a creditor could be liable for a debt collector's TCPA violations, the Order does not make such liability per se or automatic, as Henderson argues. To the contrary, in a 2013 order, the FCC clarified that a court should determine whether a defendant is vicariously liable for the TCPA violations of a third-party caller by using federal common law agency principles. *In re Joint Petition Filed by Dish Network, LLC*, 28 F.C.C. Rcd. 6574, 6574 (2013) ("2013 FCC Order").

Henderson's per se liability argument also ignores *Gomez v. Campbell-Ewald Co.*, which held that "a defendant may be [] vicariously liable for TCPA violations where the plaintiff establishes an agency relationship, as defined by federal common law, between the defendant and a third-party caller." 768 F.3d 871, 879 (9th Cir. 2014), *aff'd*, 136 S. Ct. 663 (2016), *as revised* (Feb. 9, 2016). To reach this conclusion, *Gomez* interpreted the 2013 FCC Order. *Id.* at 878.

*Gomez* makes clear that a court may not automatically attribute a third-party caller's TCPA violations to a defendant. *Id.* In other words, there is no per se liability. A plaintiff, according to *Gomez*, must show that there is an agency relationship between a defendant and a third-party caller for there to be vicarious liability for TCPA violations. *Id.* Accordingly, under both FCC Orders and our precedent, the per se liability argument fails.

## III.    Federal Common Law Agency Principles

A court may hold lenders, like USA Funds, vicariously liable for the TCPA violations of third party callers, like the debt collectors, "where the plaintiff establishes an agency relationship, as defined by federal common law, between the defendant and [the] third-party caller." *Gomez*, 768 F.3d at 879. We rely on the Restatement (Third) of Agency for common law agency principles. *See, e.g.*, *Mavrix Photographs, LLC* v. *LiveJournal, Inc.*, 873 F.3d 1045, 1054 (9th Cir. 2017). "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement § 1.01. There are several ways to establish an

agency relationship, including actual authority and ratification. Restatement §§ 2.01, 4.01.

Whether an agency relationship exists is for a court to decide based on an assessment of the facts of the relationship and not based on how the parties define their relationship. Restatement § 1.02; *see also U.S. v. Milovanovic*, 678 F.3d 713, 725 (9th Cir 2012) (finding an agency relationship even though the parties' agreements labeled them as independent contractors). Thus, it is not dispositive, as USA Funds argues, that the agreements between USA Funds, Navient, and the debt collectors define their relationships as independent contractors.

Moreover, it is appropriate to consider whether the parties are trying to limit or prevent liability by characterizing their relationship as something other than an agency relationship. Restatement § 1.02 cmt. b. Henderson alleges that USA Funds is doing just that. More specifically, she argues that USA Funds, Navient, and the debt collectors had a "wink-and-a-nudge" agreement to use unlawful calling practices notwithstanding their independent contractor agreements.

Finally, Henderson has the burden of establishing that an agency relationship exists. Restatement § 1.02 cmt. d.; *see also, e.g.*, *Romak USA, Inc. v. Rich*, 384 F.3d 979, 985 (8th Cir. 2004); *Bridas S.A.P.I.C. v. Government of Turkmenistan*, 345 F.3d 347, 356 (5th Cir. 2003); *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 198 (3d Cir. 2001). Henderson advances two agency principles that she believes makes USA Funds liable for the debt collectors' TCPA violations—ratification and implied actual authority.

## A.  Ratification

"Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." Restatement § 4.01. Ratification is both an act and a set of effects. Restatement § 4.01 cmt. b. As an act, ratification is the principal's assent (or conduct that justifies a reasonable assumption of assent) to be bound by the prior action of another person or entity. Restatement § 4.01. As a set of effects, ratification creates consequences of actual authority, including, in some circumstances, creating an agency relationship when none existed before. Restatement § 4.01 cmt. b.

There are two ways to ratify a third party's acts. The first is by a "knowing acceptance of the benefit." To prove this form of ratification, there must be "an objectively or externally observable indication . . . that the principal has exercised choice and has consented" to the acts of the purported agent. Restatement § 4.01 cmt. d. That means that the principal must have "knowledge of material facts," also described as "actual knowledge." Restatement § 4.06. The second way a principal can ratify the acts of a third party is through "willful ignorance." Under the "willful ignorance" theory, the principal may not know the material facts, but has "ratified with awareness that such knowledge was lacking." Restatement § 4.01 cmt. b. In effect, the principal can ratify the act of a third party—thereby making the third party the principal's agent—even if it does not know all the material facts, but it must be aware that it does not know the material facts and ratify anyway.

### 1. Ratification May Create An Agency Relationship When None Existed Before

USA Funds argues it could not have ratified the actions of the debt collectors because there is no agency relationship between it and the debt collectors. We disagree. Restatement § 4.01 cmt. b makes clear that, in most jurisdictions, ratification may create an agency relationship when none existed before if the acts are "done by an actor . . . who is not an agent but pretends to be."

*Kristensen v. Credit Payment Servs. Inc.* is the only case in our circuit, or any circuit, that analyzes in what circumstances ratification may create an agency relationship when none existed before as described in the Restatement (Third) of Agency. 879 F.3d 1010 (9th Cir. 2018). It also happens to be a TCPA case. In *Kristensen*, Plaintiff Kristensen received a text message from a texting publisher, AC Referral, on his cell phone without his prior consent. *Id.* at 1012. AC Referral sent the text messages as part of a marketing campaign for payday lenders. *Id*.

Kristensen brought a TCPA class action against the lenders and marketing companies but not AC Referral, the entity that sent the texts. *Id*. at 1013. The district court granted summary judgment in favor of the defendants, rejecting Kristensen's theories of vicarious liability, including his theory that the defendants ratified AC Referral's unlawful texting campaign by accepting customer leads while knowing that AC Referral was using texts to generate those leads. *Id*. We affirmed the district court's grant of summary judgment, holding that "[b]ecause AC Referral (which is not a party to the suit) was neither the agent nor purported agent [ ] of the defendants, they could not have ratified AC Referral's acts." *Id.* at 1012.

Unlike the texting publisher in *Kristensen*, here, a reasonable jury could find that the debt collectors pretended and demonstrably assumed to act as USA Funds' agents. *See* Restatement § 4.01 cmt b. As previously described, the debt collectors collected on unpaid loans by calling the student-borrowers. The collectors told the borrowers that they were calling about a loan owned by USA Funds. Without needing USA Funds' approval, the collectors negotiated, deferred, and took payments on USA Funds' behalf. In *Kristensen*, the texting publisher did not pretend to be the lenders' agent because the publisher did not identify itself in the text message. *Id.* at 1012. Rather, the text message simply included a link to the lenders' website. *Id.* Before the litigation, none of the text message recipients knew that AC Referral had sent the text messages. *Kristensen v. Credit Payment Servs. Inc.*, 12 F. Supp. 3d 1292, 1297 (D. Nev. 2014). Because here, unlike in *Kristensen*, the debt collectors did purport to act as agents of USA Funds, *Kristensen*'s material facts are distinguishable from the facts in this case, and therefore, its holding is not binding here.

### 2. USA Funds May Have Ratified The Debt Collectors' Calling Practices

Because *Kristensen*'s holding does not apply in this case, we must resolve whether a triable issue of fact exists as to whether USA Funds' conduct "justifies a reasonable assumption" that it assented to the debt collectors' allegedly unlawful calling practices. Restatement § 4.01. Comment d explains the kind of conduct that constitutes ratification, including "conduct justifiable only on the assumption that [a] person consents to be bound by [an] act's legal consequences." § 4.01 cmt. d. The illustration to comment d illuminates this point.

In the illustration, a used car dealer (the principal) employs a retail salesperson (the agent) not authorized to make public statements for the dealer. When the salesperson defames the dealer's competitor on TV, and the dealer congratulates the salesperson's TV appearance, the dealer ratified the salesperson's tortious conduct. To constitute ratification, therefore, a principal need not explicitly communicate consent to an agent. Similarly, failure to object to or repudiate an action may indicate approval when an agent is likely to draw such an inference from a principal's silence. § 4.01 cmt. f. The focal point of ratification is an observable indication that a principal has exercised an explicit or implicit choice to consent to the purported agent's acts. § 4.01 cmt. d.

For example, "[a] person may ratify an act . . . by receiving or retaining benefits it generates if the person has knowledge of material facts." § 4.01 cmt. g. Here, a reasonable jury could conclude that USA Funds accepted the benefits—loan payments—of the collectors' calls while knowing some of the calls may have violated the TCPA. If a jury concluded that USA Funds also had "knowledge of material facts," USA Funds' acceptance of the benefits of the collector's unlawful practices would constitute ratification.

Restatement § 4.06 requires that a principal knows of the material facts involved in the act it is ratifying. This knowledge requirement is met if the principal either has "actual knowledge" or "choose[s] to affirm without knowing the material facts." § 4.06 cmt. b. Comment d adds that "a factfinder may conclude that a principal has made such a choice when the principal is shown to have had knowledge of facts that would have led a reasonable person to investigate further, but the principal ratified without further

investigation." § 4.06 cmt. d. This can also be described as "willful ignorance."

Here, there is evidence that USA Funds communicated consent to the debt collectors through acquiescence in their calling practices that allegedly violated the TCPA. In other words, a reasonable jury could find that USA Funds ratified the debt collectors' calling practices by remaining silent and continuing to accept the benefits of the collectors' tortious conduct despite knowing what the collectors were doing or, at the very least, knowing of facts that would have led a reasonable person to investigate further.

### i.   Actual Knowledge

There is evidence in the record that USA Funds had actual knowledge of the debt collectors' allegedly unlawful calling practices. "The fact that the principal had knowledge may be inferred" by circumstantial evidence. Restatement § 4.06 cmt. b. Henderson claims that starting in 2009, debt collectors called her every 30 to 40 minutes on a number she did not provide in connection with her student loans. The calling practice described by Henderson is consistent with several of USA Funds' audit findings and its general understanding of the debt collection industry.

USA Funds does not dispute that it knew that some of the debt collectors used auto dialers. Evidence in the record shows that USA Funds knew that both auto dialing and skip tracing are ubiquitous in the debt collection industry. While collectors may legally use each method separately, several of USA Funds' audits found that its debt collectors might have violated the TCPA by combining these methods. Despite these findings, USA Funds made no effort to end its relationship with any of these debt collectors or to ensure future TCPA compliance. Instead, it continued to accept the

benefits of the collectors' conduct. Under these circumstances, the debt collectors were "likely to draw [the] inference" that USA Funds' silence manifested its assent to these practices. § 4.01 cmt. f.

*Hodgin v. UTC* is the only circuit case, other than *Kristensen*, to apply ratification in the TCPA context. 885 F.3d 243 (4th Cir. 2018). In *Hodgin*, home security system manufacturers entered into sales agreements with retailers through distributors. *Id.* at 246–48. When the manufacturers received multiple complaints about their retailers' telemarketing practices from consumers, including practices that allegedly violated the TCPA, the manufacturers investigated those complaints and ultimately terminated the sales agreements with the offending retailers. *Id.* Unlike the defendant in *Hodgin*, which fired the retailers that had allegedly violated the TCPA, USA Funds did not direct Navient to fire the debt collectors it knew were using calling practices that allegedly violated the TCPA despite having directed Navient to fire underperforming debt collectors. Nor did USA Funds terminate its contract with Navient. USA Funds' objective was clear—collect as much money as possible.

This evidence suggests that USA Funds consented—with material knowledge—to the debt collectors' likely unlawful calling practices. Therefore, a triable issue of fact exists as to Restatement § 4.06's actual knowledge requirement.

### ii. Willful Ignorance

Even if the facts are insufficient to infer actual knowledge by USA Funds that the debt collectors were violating the TCPA, USA Funds at a minimum "had knowledge of facts that would have led a reasonable person

to investigate further." § 4.06 cmt. d. USA Funds' audit findings combined with its knowledge about common practices in the industry should have alerted USA Funds that it needed to investigate further. Instead, USA Funds continued to accept the benefits of the debt collectors' violations and to remain silent about the collectors' legal obligations under the TCPA.

Indeed, the record suggests that USA Funds set up the collection structure between itself, Navient, and the debt collectors to remain willfully ignorant and avoid liability. For example, USA Funds' directions to Navient and the debt collectors were general and open-ended. USA Funds did not set performance or operational standards for Navient or the debt collectors. Nor did USA Funds or Navient have policies or procedures in place to ensure their debt collectors' calling practices complied with the TCPA. USA Funds did not receive information about the debt collectors' calling practices, and it did not monitor the debt collectors' skip tracing activities. USA Funds forwarded all consumer complaints about the debt collectors to Navient, including alleged TCPA violations. Triable issues of fact exist, therefore, as to whether USA Funds ratified the debt collectors' actions through willful ignorance.

Accordingly, based on the evidence in the record, we hold that a reasonable jury could find that USA Funds ratified the debt collectors' calling practices that allegedly violated the TCPA. We, therefore, need not address whether the debt collectors acted with implied actual authority.

### *CONCLUSION*

For the preceding reasons, we **REVERSE** the district court's grant of summary judgment in favor of Defendant-

Appellee USA Funds and **REMAND** for further proceedings.

---

BYBEE, Circuit Judge, dissenting:

I agree with the majority that FCC Orders do not create per se liability under the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227. Maj. Op. at 7; *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 879 (9th Cir. 2014), *aff'd*, 136 S. Ct. 663 (2016). I am also willing to assume for purposes of this case that ratification may create an agency relationship when none existed before. Maj. Op. at 10; Restatement (Third) of Agency § 4.01 cmt. b (2006). I disagree with the majority, however, that there is a material issue of fact as to whether USA Funds ratified the debt collectors' conduct or whether USA Funds granted the debt collectors implied actual authority to violate the TCPA. I would affirm the judgment of the district court.

I

Under the TCPA, it is unlawful "to make any call (other than . . . with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227(b)(1)(A)(iii). Any debt collector who autodialed Henderson in this case would be liable under this section, because she was called on a phone number she had not provided in connection with her loan. However, we are not addressing the liability of the debt collectors , nor that of Navient Solutions, Inc., the company that contracted with the debt collectors. Instead, this case concerns USA Funds alone, which acquired Henderson's student loan debt from

the Department of Education and contracted with Navient to hire and manage the debt collectors.  Henderson would have had a much stronger case against the debt collector that called her, and, perhaps, even against Navient.  But because that issue is outside the scope of our review, Henderson has to show that USA Funds either (1) ratified practices that violated the TCPA or (2) granted the debt collectors authority to violate the TCPA.  I can't get to either proposition from the evidence Henderson has mustered.

Before addressing the merits of Henderson's arguments, however, let's start with what we know about skip-tracing and autodialing.  First, skip-tracing is the "[t]he action or practice of locating people who are missing or have defaulted on a debt," typically through online resources. *Skip-tracing*, Oxford Dictionary (2019).  It is a perfectly lawful means of obtaining debtors' additional phone numbers that they did not provide to the lender.  Indeed, Department of Education regulations not only approve the practice, they require it.  The relevant provision states that "within 10 days of its receipt of information indicating that it does not know the borrower's current address, *the lender must begin to diligently attempt to locate the borrower through the use of effective commercial skip-tracing techniques*."  34 C.F.R. § 682.411(h)(1) (emphasis added). Autodialing refers to the process by which a mechanical device or software dials telephone numbers automatically. When the recipient answers the call, the device or software plays a recorded message or connects the recipient to a real person.  As anyone who has received these automated calls can attest, autodialing can be an obnoxious practice.  That said, it is not, in and of itself, unlawful.  Autodialing to collect a debt does not violate the TCPA if the phone number is one that the debtor provided.  In fact, the TCPA specifically authorizes autodialed calls if the call "is made

solely to collect a debt owed to or guaranteed by the United States."  47 U.S.C. § 227(b)(1)(A)(iii); *see also In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 31 FCC Rcd. 9074, 9082–83 & n.54 (2016) (limiting the provision to debts owed to or guaranteed by the United States).  The TCPA thus prohibits an autodialer from calling a phone number that the debtor did not provide—for example, a number obtained through skip-tracing.

Henderson alleges that debt collectors used skip-tracing to obtain a phone number she did not provide and then repeatedly autodialed her on that number.  She argues that USA Funds is liable for these violations because it (1) ratified the debt collectors' TCPA violations or (2) gave the debt collectors implied actual authority to violate the TCPA.  The majority addressed the first question alone; I am going to address both.

A.  *Ratification*

Under the *Restatement of Agency*, "[a] person ratifies an act by . . . conduct that justifies a reasonable assumption that the person so consents."  Restatement (Third) of Agency § 4.01(2)(b).  There are two ways to ratify a third party's acts.  The first is by a "knowing acceptance of a benefit," which requires "an objectively or externally observable indication . . . that the principal has exercised choice and has consented."  *Id.* § 401 cmt. d.  This means that the principal must have "knowledge of material facts."  *Id.* § 4.06.  The second is through a form of "willful ignorance."  Under this theory, the principal may not know the material facts but "ratified [the conduct] with awareness that such knowledge was lacking."  *Id.* § 4.01 cmt. b.  In other words, the principal is aware that it does not know the material facts, and yet it ratifies the conduct anyway.

The majority concludes that Henderson put forth sufficient facts, that if accepted by a jury, prove either theory of ratification:  "USA Funds ratified the debt collectors' calling practices by remaining silent and continuing to accept the benefits of the collectors' tortious conduct despite knowing what the collectors were doing or, at the very least, knowing of facts that would have led a reasonable person to investigate further."  Maj. Op. at 14.  I will address each theory of ratification in turn.

### 1.  Actual Knowledge

The majority first holds that there are sufficient facts in the record on summary judgment to prove that "USA Funds had *actual knowledge* of the debt collectors' allegedly unlawful calling practices."  *Id.* at 14 (emphasis added).  The majority recites two facts:  "USA Funds knew that both auto dialing and skip tracing are ubiquitous in the debt collection industry" and "USA Funds' audits found that its debt collectors might have violated the TCPA."  *Id.* at 14–15.  From these two claims, the majority deduces that USA Funds knew that debt collectors "violated the TCPA by combining [skip-tracing and autodialing]" and "assent[ed] to these practices."  *Id.*  There is no support in the record for this conclusion.  As I have pointed out (and the majority concedes), skip-tracing and autodialing are lawful collection techniques, so their ubiquity is not surprising.  It is only when they are used in tandem that the practice violates the TCPA.  There is some evidence that USA Funds knew that debt collectors employed by Navient had used improper practices, but scant evidence they knew the debt collectors used skip-tracing and autodialing in combination.  And there is no evidence whatsoever that USA Funds *approved* of such practices.  In fact, the only evidence in the record is to the contrary:  when USA Funds learned of wrongful practices, it

reported them to Navient and asked Navient to correct the problem.

Here is what the record shows us. USA Funds' agreement with Navient required that Navient and its vendors comply with all federal regulations. For its part, USA Funds maintains an 800-number to receive customer complaints and has an email on its website for complaints or inquiries. USA Funds also conducts regular audits of its accounts, as required by statute and regulation. *See* 20 U.S.C. § 1094(c)(1)(C)(i); 34 C.F.R. § 682.410(b)(1). When USA Funds learns of possible TCPA violations through an audit or customer complaint, it reports them to Navient, and asks Navient to take corrective action. All of the information we have on USA Funds' audits comes from the deposition of one USA Funds employee—Kevin Tharp, the manager of the delinquency and default management section, who had been employed at USA Funds for thirty-seven years and had been the section head for twenty years. Under the audit guidelines, USA Funds examines at least 150 randomly selected accounts for compliance with repayment programs, such as loan rehabilitation and wage garnishment. In the process of reviewing the selected accounts, USA Funds reviews collection efforts and, in particular, skip-tracing, because it is required by Department of Education regulations. 34 C.F.R. § 682.411(h)(1).

Tharp explained that USA Funds has no contractual relationship with the debt collectors and no authority to hire, fire, or discipline them. What USA Funds did when it learned of potential violations was "recommend corrective action" to Navient. This corrective action might range from Navient directing the debt collector to remove the phone number from the autodialer to withholding payment from the debt collector. Tharp was asked if he knew of any instance

in which a debtor complained to USA Funds of being autodialed or even called on a number he or she did not consent to be called on.  Here is the exchange:

> Q:   "Has USA Funds ever received a complaint from a borrower . . . about the borrower being called on a cellular telephone that they hadn't consented to being called on by a collections agent calling about a USA Funds' guaranteed loan?"
>
> A:  "Not that I'm aware of."

He was then asked about auto-dialing:

> Q:  "Do you know whether USA Funds has ever received a complaint from a borrower relating to the use of a dialer on a USA Funds' guaranteed loan?"
>
> A:  "None that I'm aware of [aside from this case]."

The only examples of "improper" efforts that Tharp was questioned about do not reveal any information about the use of skip-tracing and autodialing.  The first was a 2010 audit by USA Funds, which identified what was described as the "calling of an incorrect phone number."  Although the majority assumes the worst, Tharp was never asked whether the phone number was obtained through skip-tracing.  In fact, there is no evidence that the "incorrect phone number" was even another phone number of the debtor's or was just a wrong number entirely.  The only other "improper collection effort[]" identified in the deposition reflects the same lack of information.  A 2000 audit revealed that a

phone "not associated with the borrower was repeatedly called." However, again, it is unclear whether it was a number the debtor did not consent to or just a wrong number. The questioning, in fact, suggests that it was not even an additional number of the debtors': "the repeat finding was that there had been a number called that wasn't the borrower." This questioning of Tharp yielded no evidence that numbers were obtained through skip-tracing or called with autodialers. There is simply no support for the majority's conclusion that USA Funds knew that the collectors were using autodialers in combination with skip-tracing and approved of the practice.

Henderson also deposed Mark Verbrugge, senior director of operations for Navient, but his answers don't help her either. Verbrugge testified that Navient conducts its own audits. It monitors whether the debt collectors were autodialing or manually dialing phone numbers through on-site visits. Navient also reviews customer complaints, including those made directly to Navient, or through an ombudsman or an agency, such as the Better Business Bureau. Navient has taken corrective action, including directing the debt collector to change its collection methods and cease all contact. Verbrugge also testified that Navient did not typically inform USA Funds of what dialers the debt collectors used, and he did not know of any instances where Navient informed USA Funds that autodialers were used to call skip-traced numbers. Nor did he know whether USA Funds was able to obtain that information through its own audits.

Nothing here shows that USA Funds ratified "improper collection efforts." The sum of Henderson's evidence regarding USA Funds' ratification of improper dialing consists of USA Funds' own audit that shows that it

disapproved of general TCPA violations and took affirmative steps to discourage it. That is not ratification under any fair reading of the *Restatement of Agency*. The whole point of the audits by USA Funds and Navient to ensure compliance with federal law. Both Tharp and Verbrugge testified that when their audits disclosed improper collection efforts, Navient—sometimes on its own initiative and sometimes at the direction of USA Funds— took corrective action, such as withholding payment, suspending a debt collector, or reducing its placements with the collector. The only record evidence shows that USA Funds took steps to ameliorate any TCPA violations, not to ratify them. The majority's claim that "USA Funds made no effort to end its relationship with any of these debt collectors or to ensure future TCPA compliance" is thus contrary to *all* the evidence in the record. Maj. Op. at 14–15. In the end, the only evidence Henderson has of an unlawful practice is her own testimony that she was autodialed on a phone number she didn't provide to her lender. That might be sufficient to show that someone violated the TCPA, but it doesn't prove a thing about USA Funds' complicity any violations. But under the majority's theory of ratification, if a debt guarantor like USA Funds knows that there are violations "in the debt collection industry," *id.*, it is liable for the debt collectors' actions, even if USA Funds has taken corrective action. That is not a theory of *ratification*—it is *strict liability*, and nothing in the TCPA authorizes such a broad theory.

## 2. Willful Ignorance

The majority holds, in the alternative, that "[e]ven if the facts are insufficient to infer actual knowledge by USA Funds that the debt collectors were violating the TCPA, USA Funds at a minimum 'had knowledge of facts that would

have led a reasonable person to investigate further.'"  *Id.* at 15–16 (quoting Restatement (Third) of Agency § 4.06 cmt. d).  It states that "USA Funds' audit findings combined with its knowledge about common practices in the industry should have alerted USA Funds that it needed to investigate further," but it willfully chose not to.  *Id.*  Once again, the record does not support this holding.

As discussed above, the only evidence in the record shows that when USA Funds discovered TCPA violations through an audit or customer complaint, it reported the complaint to Navient and recommended corrective action— it did not "willfully ignore" anything.  The debt collectors were not USA Funds' vendors to hire and fire; they were hired and supervised by Navient.  It was then Navient's responsibility to ensure the offending debt collector corrected its actions.  Henderson provided no evidence that Navient failed to follow up on USA Funds' requests for action, or that USA Funds made these requests and then looked the other way.  The majority emphasizes that USA Funds did not "terminate its contact with Navient," *id.* at 15; however, there is no evidence in the record that USA believed—or even had reason to believe—that Navient was mishandling the complaints or ignoring USA Funds' recommended corrective action.   To the contrary, the undisputed testimony from the only Navient witness (Verbrugge) is that Navient took USA Funds' requests "under strong consideration."

The majority asserts that because USA Funds did not instruct Navient to fire the collectors and "made no effort . . . to ensure future TCPA compliance," the debt collectors were "'likely to draw [the] inference' that USA Funds' silence manifested its assent" to the TCPA violations.  *Id.* at 14–15 (quoting Restatement of Agency § 4.01 cmt. f).  But USA

Funds had no contractual relationship with the debt collectors—it could not fire them because it never hired them in the first place. Rather, it reported any complaints to Navient and gave Navient full authority to handle them— including the authority to fire offending debt collectors without USA Funds' interference. But in any event, the majority's minor premise—that USA Funds "made no effort"—is contrary to the only evidence in the record, and its conclusion—that debt collectors would "infer[] . . . assent"—is pure speculation, because Henderson did not sue, or even depose, any debt collector. *Id.* I simply do not see how USA Funds can be deemed to have willfully ignored wrongful practices if the only evidence provided shows that it consistently tried to correct them.

Lastly, the majority asserts that the "collection structure" between USA Funds and Navient allowed USA Funds "to remain willfully ignorant and avoid liability." *Id.* at 16. I am not naive about what is going on here, and the majority may have a broader point to make. The way that USA Funds structured its collection efforts—hiring Navient to manage the hiring of collection agencies—may suggest that USA Funds is trying to shield itself from the dark underbelly of the debt-collection business. But unless we are prepared to indict the entire industry and hold everyone involved responsible based solely on general industry violations and collection structures (which likely would include the Department of Education itself), I do not see the evidence to satisfy agency principles. I repeat that the majority's holding sounds in strict liability, and I think this decision will send shudders through the industry. Maybe that is a good thing, but I don't see our mandate in the TCPA to cause such disruption. It is better for the Department of Education, the FCC, or Congress to address the matter.

B.  *Implied Actual Authority*

Because I find that Henderson did not create a genuine issue of material fact that USA Funds ratified the debt collectors' actions, I must also briefly address her claim that USA Funds gave the debt collectors implied actual authority to violate the TCPA.  This argument fails for much the same reasons as her ratification theory.  "The legal consequences of an agent's actions may be attributed to a principal when the agent has actual authority (express or implied) or apparent authority."  *Salyers v. Metro. Life Ins. Co.*, 871 F.3d 934, 940 (9th Cir. 2017) (citing Restatement (Third) of Agency § 2 intro. note).  "Implied actual authority comes from a general statement of what the agent is supposed to do; an agent is said to have the implied authority to do acts consistent with that direction."  *NLRB v. Dist. Council of Iron Workers of Cal. & Vicinity*, 124 F.3d 1094, 1098 (9th Cir. 1997).

Henderson argues that the debt collectors acted with implied actual authority from USA Funds because they "reasonably believed, based on USA Funds' manifestations and actions, that they had authority to act as USA Funds' agent in all aspects of the transactions with debtors."  We have no evidence in this record from any debt collector as to what the debt collector believed about USA Funds or why that belief was reasonable.  Henderson's speculative assertions are insufficient to create a genuine issue of material fact that the debt collectors reasonably believed that USA Funds approved of their TCPA violations—particularly when the only evidence in the record is that Navient would withhold payment or cease working with the debt collectors if TCPA violations occurred.  Any debt collector who believed that USA Funds approved of TCPA violations would do so unreasonably.  *See* Restatement

(Third) of Agency § 2.01 (requiring the agent's belief be reasonable); *see id.* cmt. c ("The focal point for determining whether an agent acted with actual authority is the agent's reasonable understanding at the time the agent takes action.").

Although a "smoking gun may not be needed" to overcome a motion for summary judgment, Ms. Henderson still must provide "something more than speculative, conclusory allegations." *Towers v. Iger*, 912 F.3d 523, 532 (9th Cir. 2018).

## II

Henderson has not provided sufficient evidence to create a genuine issue of material fact that USA funds knew or willfully ignored TCPA violations, nor that it granted implied actual authority to the debt collectors to violate the TCPA. For these reasons, I respectfully dissent. I would affirm the judgment of the district court.